# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KENNETH SLAUGHTER,
    Plaintiff

    v.

HARTFORD LIFE & ACCIDENT
INSURANCE COMPANY,
    Defendant

No. 22 CV 5787

Judge Jeremy C. Daniel

## MEMORANDUM OPINION AND ORDER

Plaintiff Kenneth Slaughter filed this action under § 501 (a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), seeking to recover benefits under a group long-term disability ("LTD") insurance policy issued by Hartford Life & Accident Insurance Company ("Hartford"). Pending before the Court are Slaughter's motion for summary judgment under Federal Rule of Civil Procedure 56, (R. 27), and Hartford's motion for judgment under Federal Rule of Civil Procedure 52. (R. 31.) For the reasons discussed below, the Court grants Hartford's motion and denies Slaughter's motion.

## LEGAL STANDARD

### I.    RULE 52 VERSUS RULE 56

Before addressing the merits of the parties' respective motions, the Court must first determine the appropriate standard for evaluating them. Slaughter moves for summary judgment under Rule 56(a), while Hartford moves for judgment pursuant to Rule 52(a). Under Rule 56(a), judgment is proper where "the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In contrast, Rule 52(a) governs actions "tried on the facts without a jury," and requires the Court to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a). Under Rule 52(a), the Court "reviews the stipulated record, resolves any factual disputes, and determines the outcome of the case." *Snapper v. Unum Life Ins. Co. of Am.*, 662 F. Supp. 3d 804, 812 (N.D. Ill. 2023) (citing *Migliorisi v. Walgreens Disability Benefits Plan*, No. 06 C 3290, 2008 WL 904883, at *1 (N.D. Ill. Mar. 31, 2008)). "This procedure is essentially a trial on the papers, . . . and is well-suited to ERISA cases in which the court reviews a closed record." *Fontaine v. Metro. Life Ins. Co.*, 800 F.3d 883, 885 (7th Cir. 2015).

In a joint status report filed on September 7, 2023, the parties agreed that Rule 52(a) was the appropriate vehicle to resolve the issues presented in this case. (R. 21 at 2.) No discovery was conducted, and the parties stipulated to adjudicate this matter based on the evidence in the administrative record. (*Id.* at 2; R. 32 at 1; R. 35 at 3.) Notwithstanding, Slaughter moved for summary judgment under Rule 56(a). He explains that, despite his prior agreement to resolution under Rule 52, Hartford's "failure to refute the medical and vocational evidence" that he submitted during the claims process "leaves no questions of fact to be decided by the Court" and, thus, he is entitled to LTD benefits as a matter of law. (R. 35 at 1.) Slaughter offers no other justification for backtracking on his prior representations, nor does he identify any way in which he would be prejudiced by consideration of the motion under Rule 52.

2

"Courts in this Circuit have frequently observed that, in the context of ERISA disputes over the denial of benefits, proceeding under Rule 52 may be preferable to motions for summary judgment under [Rule 56]." *Snapper*, 662 F. Supp. 3d at 812 (collecting cases). Indeed, the Seventh Circuit "has suggested that Rule 52(a) is the applicable standard of review in an ERISA case where"—as here— "the parties have stipulated to facts that made up the administrative record." *Paulus v. Isola USA Corp. Ret. Plan*, 2014 WL 462367, at *1 (W.D. Wis. Feb. 5, 2014) (quoting *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)). This is because Rule 52(a) "offers certain advantages over cross-motions for summary judgment," including efficiency, *Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 992 (N.D. Ill. 2003) ("Clearly, it is more efficient to reach the same determination on the same record by skipping cross-motions for summary judgment and proceeding directly to a trial on the papers, where all possible issues can be resolved by the court."), and finality. *See id.* at 991 ("[A Rule 52 motion] is certain to result in a decision for one party rather than present the risk of a non-decision if the cross-motions for summary judgment are both denied."). Indeed, as the Seventh Circuit has noted, "[i]f on a certain record a district court believes a party is entitled to summary judgment, then the same court, if required to conduct a bench trial on that same record, will probably decide the same for that same party." *Patton v. MFS/Sun Life Fin. Distribs., Inc.*, 480 F.3d 478, 484 (7th Cir. 2007).

With this background in mind, the Court fails to see how the absence of questions of fact, as Slaughter argues, makes this case more amenable to resolution

under Rule 56(a) than Rule 52(a). As stated above, the parties agreed the case is to be resolved based on the administrative record. (R. 21 at 2–3.) And in "[r]eviewing the [administrative] record pursuant to [ ] Rule 52(a) . . . ," the Court "can decide the case and resolve any fact questions" should they arise. *Crespo*, 294 F. Supp. 2d at 992. Thus, notwithstanding the styling of Slaughter's motion under Rule 56(a), the Court will treat both parties' motions as motions for judgment under Rule 52(a). *See, e.g., Tran v. Minnesota Life Ins. Co.,* No. 17 C 450, 2018 WL 1156326, at *5 (N.D. Ill. Mar. 5, 2018)*, rev'd on other grounds,* 922 F.3d 380 (7th Cir. 2019) (treating the plaintiff's Rule 56(a) motion as a Rule 52(a) motion in ERISA dispute over the denial of benefits).

## II.     ERISA § 502(A)(1)(B)

A claim under ERISA § 502(a)(1)(B) is "essentially a contract remedy under the terms of the [benefit] plan." *Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 911 (7th Cir. 2013) (internal quotation marks and citation omitted). It allows a plan participant or beneficiary to "recover benefits due to him under the terms of his plan." *Id.* at 910 (citing 29 U.S.C. § 1132(a)(1)(B)). Where, as here, the benefit plan does not grant discretionary authority to the plan fiduciary, the *de novo* standard of review applies to ERISA § 502(a)(1)(B) claims. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

The concept of *de novo* review in the ERISA context can be somewhat misleading. "The confusion comes from the word review, '[f]or what *Firestone* requires is not 'review' of any kind; it is an independent *decision*,' akin to a contract dispute.'" *Dorris v. Unum Life Ins. Co. of Am.*, 949 F.3d 297, 304 (7th Cir. 2020) (quoting *Krolnik*

*v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 843 (7th Cir. 2009)) (emphasis in original). In other words, "what happened before the plan administrator is irrelevant in a de novo review case." *Id.* (citations omitted). Rather, the Court "must come to an independent decision on both the legal and factual issues that form the basis of [Slaughter's] claim," *i.e.,* whether he is entitled to the LTD benefits that he seeks. *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007); *see also Dorris*, 949 F.3d at 305.

## FINDINGS OF FACT[1]

Slaughter is a former employee of The Boeing Company ("Boeing"). (Def.'s PFF ¶ 16; Pl.'s SOF ¶ 30.) At Boeing, he worked as a systems engineer focusing on systems cybersecurity. (Def.'s PFF ¶ 16.) Slaughter's last day of work at Boeing was August 24, 2020. (Admin. Rec. at 1117.)

Hartford is an insurance company. (Def.'s PFF ¶ 1.) At all relevant times, Hartford issued a Group Long Term Disability Plan (the "Plan") to Boeing employees, including Slaughter. (*Id.*) The Plan provides for monthly disability payments to plan participants who are disabled due to accidental bodily injury, sickness, mental illness, substance abuse, or pregnancy during and beyond the Plan's twenty-six-week

---

[1] The following Findings of Fact are based on the Administrative Record, (R. 26-1 to R. 26-5 ("Admin. Rec.")), as well as Plaintiff's Statement of Material Facts, (R. 30 ("Pl.'s SOF")); Hartford's Proposed Findings of Fact, (R. 33 ("Def.'s PFF")); Hartford's Response to Plaintiff's Statement of Material Facts, (R. 34 ("Def.'s Resp. to Pl.'s SOF")); Plaintiff's Response to Defendant's Proposed Findings of Facts and Statement of Additional Facts, (R. 36 ("Pl.'s Resp. to Def.'s PFF and Pl.'s SOAF")); and Hartford's Response to Plaintiff's Statement of Additional Facts, (R. 39 ("Def.'s Resp. to Pl.'s SOAF").) For citation purposes, the Court cites to the Administrative Record's corresponding Bates numbers. As for other CM/ECF filings, the Court cites to the page number(s) set forth in the document's CM/ECF header unless citing to a particular paragraph or other page designation is more appropriate.

"Elimination Period" (*i.e.,* the period of time which must elapse before benefits are payable). (Admin. Rec. at 1178, 1183, 1192.)

On August 27, 2020, Slaughter went to St. Luke's Hospital emergency department in Chesterfield, Missouri, complaining of chest pains and shortness of breath. (*Id.* at 740–44.) He was admitted and remained hospitalized until September 4, 2020. (*Id.* at 721.)

Following his admission, Slaughter was seen by his cardiologist, James Ellison, M.D. (*Id.* at 372.) Slaughter reported that he had been experiencing worsening shortness of breath for about a week. (*Id.* at 465.) He explained that "when he walks on a flat surface not carrying anything, he can go 40 feet without too much trouble, but if he gets on an incline or tries to climb stairs or has to carry anything, he could not go more than about 10 feet without becoming exhausted." (*Id.*) Slaughter told the doctor that his shortness of breath caused him anxiety. (*Id.*)

Dr. Ellison's clinical impression of Slaughter's symptoms was "multifactorial, including probable diastolic heart failure and some degree of restrictive and perhaps obstructive lung disease." (*Id.* at 467.) Ellison further indicated that Slaughter has a history of cardiomyopathy, a disease affecting the heart's ability to pump blood to the rest of the body.[2] (*Id.*) He ordered a transthoracic echocardiogram to measure how

---

[2] *See* Cardiomyopathy, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/16841-cardiomyopathy. The Court notes that it referred to this website to define certain medical terms not defined by the parties. In this sense, the definitions provide context and do not constitute factual findings.

well Slaughter's heart pumped blood out of its ventricles, *i.e.,* his heart's ejection fraction.[3] (*Id.*)

The echocardiogram measured Slaughter's left ventricular ejection fraction at 8%,[4] resulting in a finding of "VERY SEVERE left ventricular systolic dysfunction." (*Id.* at 706.) The medical records noted that Slaughter's left ventricular contractibility had deteriorated compared to an October 2019 echocardiogram in which his ejection fraction was 45%. (*Id.* at 706, 754, 780.) On September 1, 2020, Slaughter underwent a procedure in which he received an implantable cardioverter-defibrillator ("ICD"). (Def.'s PFF ¶ 30; Pl.'s SOF ¶ 10; Admin Rec. at 917–19.) Following the procedure, Slaughter's left ventricular ejection infraction improved to 23%. (Admin. Rec. at 451.)

Slaughter was discharged from the hospital on September 4, 2020. (*Id.* at 721.) His diagnoses included chronic systolic and diastolic heart failure. (*Id.*) He was instructed to avoid strenuous activity and to follow up with Dr. Ellison. (*Id.* at 721, 723.) Prior to his discharge, Slaughter met with psychiatrist Srinivas Chilakamarri, M.D., for anxiety. (*Id.* at 477.) Dr. Chilakamarri diagnosed Slaughter with generalized anxiety disorder, depression, panic, and poor sleep. (*Id.* at 481.) Slaughter was offered cognitive behavioral therapy and support counseling. (*Id.* at 482.) There are no records indicating that Slaughter pursued either of these treatment options.

---

[3] *See* Ejection Fraction, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/article s/16950-ejection-fraction.

[4] According to the Cleveland Clinic, a "normal" ejection fraction is 50% to 70%. *See* Ejection Fraction, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/articles/169 50-ejection-fraction.

Following his hospitalization, between September 18, 2020, and January 26, 2021, Slaughter saw Dr. Ellison a total of seven times. (*Id.* at 887, 891, 895, 898, 901, 904.) In October 2020, Dr. Ellison approved Slaughter to start cardiac rehabilitation, (*id.* at 993), and, following an appointment in December 2020, Dr. Ellison noted that Slaughter may be able to return to work at the end of February. (*Id.* at 897.) On January 22, 2021, Dr. Ellison ordered another echocardiogram, which measured Slaughter's left ventricular ejection fraction as 42%—a result similar to that of his 2019 echocardiogram. (*Id.* at 780, 987–88.) During a follow-up appointment on January 26, 2021, Dr. Ellison noted the following:

> [Slaughter] continues with occasional lightheaded spells. * * * He has not had syncope [fainting].[5] He does not complain of chest pain or unusual shortness of breath. He sleeps reasonably well. He does have a new CPAP system which his wife thinks is helping. Patient does have an ICD but he notes there is no AED [automated external defibrillator] at work. When he has mentioned it to management, they have been dismissive . . .

(*Id.* at 887.) Dr. Ellison's clinical notes acknowledged the improvement in Slaughter's ejection fraction and that his heart failure was "reasonably well compensated." (*Id.* at 889.) Slaughter was instructed to follow-up with Dr. Ellison within six weeks. (*Id.*) There is no record of Slaughter visiting Dr. Ellison after January 26, 2021.

Between September 2020, and January 2021, Slaughter also had one appointment with his primary care physician, Kae Chang, M.D., for a post-hospitalization follow-up on October 8, 2020, (*id.* at 1091); one appointment with

---

[5] *See* Syncope, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/17536-syncope.

gastroenterologist, Sajid Zafar, M.D., for an update on his Chron's disease on October 15, 2020, (*id.* at 1088); and two appointments with the Sleep Medicine Clinic on November 24, 2020, and December 22, 2020, to resume treatment for sleep apnea. (*Id.* at 822, 1074.)

During the November 24th visit, Slaughter met with Hasan Ali Ahmed, M.D. (*Id.* at 822.) Dr. Ahmed's notes indicated that Slaughter was diagnosed with obstructive sleep apnea in 2007, but had stopped CPAP treatment three months prior and his equipment was no longer functioning optimally. (*Id.* at 824.) Slaughter also reported experiencing REM behavioral disorder ("RBD"), which caused him to act out during his sleep. (*Id.* at 824.) During one of these RBD episodes, he rolled out of bed and injured his head, requiring thirteen staples. (*Id.* at 824–25.) Based on the consultation, Dr. Ahmed ordered a sleep study. (*Id.* at 824.) During the December 22nd visit, Slaughter met virtually with nurse practitioner Amanda Gonzales to discuss the results of the sleep study. (*Id.* at 1074.) Slaughter's results showed "overall moderate obstructive sleep apnea with severe intensity in supine position." (*Id.*) Slaughter indicated to Gonzales that he wished to restart CPAP therapy. (*Id.* at 1075.) There are no further records of CPAP treatment beyond December 22, 2020.

On January 28, 2021, Slaughter submitted an application for LTD benefits to Hartford. (*Id.* at 1116–20.) As part of his application, Slaughter included an Attending Physician's Statement completed by Dr. Ellison on January 27, 2021. (*Id.* at 1121–22.) Dr. Ellison listed Slaughter's primary condition as idiopathic cardiomyopathy, his secondary condition as chronic systolic and diastolic heart

failure, and his subjective symptoms as weakness and shortness of breath. (*Id.* at 1121.) He noted that Slaughter did not have any psychiatric or cognitive impairments. (*Id.* at 1122.)

Based on Slaughter's diagnoses, Dr. Ellison identified the following work restrictions and limitations:

- Continuously sit with standard breaks for eight hours during an eight-hour day;

- Intermittently stand for one hour at a time for a total of two hours during an eight-hour day;

- Intermittently walk for one hour at a time for a total of one hour during an eight-hour day;

- Frequently perform fine manipulation (*i.e.,* fingering, keyboard);

- Occasionally bend at waist, drive, and lift up to ten pounds;

- Occasionally perform gross manipulation (*i.e.,* grip/grasp, handle) and reach (*i.e.,* extend arms above shoulder and below shoulder at desk level); and

- Never kneel/crouch, climb, or balance.

(*Id.* at 1122.) The Attending Physician Statement defines "occasionally" as up to two and a half hours in an eight-hour period, and "frequently" as two and a half to five and a half hours in an eight-hour period. (*Id.*)

On February 17, 2021, Slaughter had a phone call with Hartford during which he related his health issues. (*Id.* at 50–51.) Slaughter told Hartford that he "sits at a desk for 8 hours" a day at Boeing. (*Id.* at 51.) He further explained that he walks from building to building and, in at least two of these buildings, he must walk up two

flights of stairs because the closest elevator is "2 football fields away." (*Id.*) Slaughter stated that he cannot climb the stairs, gets lightheaded if he walks too long, and fatigues easily if he gets out of his seat too quickly. (*Id.*) Slaughter further described a history of falls due to his lightheadedness. (*Id.*)

On March 5, 2021, as part of its claims processing, Hartford obtained the independent medical opinion of cardiologist Joseph Guzzo, M.D. (*Id.* at 871–76.) Dr. Guzzo opined that Slaughter's medical records supported a total inability to work from August 25, 2020, to September 4, 2020, and an ability to engage in "light physical demand duties" from September 5, 2020, onward. (*Id.* at 875.) Guzzo concluded that Slaughter could perform an occupation of light physical demand based on Slaughter's participation in cardiac rehabilitation, as well as a conversation that Guzzo had with Dr. Ellison in which Ellison agreed that light activity was appropriate. (*Id.*)

On March 12, 2021, Slaughter faxed a letter that was purportedly authored by Dr. Ellison to Hartford. (*Id.* at 865–67.) The letter was not written on Dr. Ellison's letterhead, and it did not include his signature; rather, it included a handwritten notation stating the letter is a "new document/notes filled out by Dr. James Ellison MD for Kenneth A. Slaughter on 3-9-2021." (*Id.* at 866.) The letter describes a discussion with Slaughter "during recent office visits," and states that "Ken has a severe heart failure condition that would prevent him from successfully performing his work tasks at Boeing St. Louis." (*Id.*) The letter further states that "[Dr. Ellison is] very certain that if [Slaughter] goes back to Boeing St. Louis to perform his work

duties . . . that he will [be] unable to successfully perform his job responsibilities without greatly leading to the progression of his heart failure condition." (*Id.* at 866–67.) The letter notes that Slaughter "has pointed out to [Dr. Ellison] that he has been working out an hour and a half each weekday at [ ] St. Luke's Hospital cardiac rehabilitation and physical exercise Wellness center . . . to help with his Heart Failure." (*Id.* at 867.) No updated medical records accompanied the letter.

On March 15, 2021, Hartford informed Slaughter that his LTD claim was denied because he did not meet the definition of "Disabled" under the Plan. (*Id.* at 184–87.) Hartford classified Slaughter's systems engineer position as a sedentary level job, requiring:

- Sitting majority of workday with occasional standing/walking for brief periods of time;

- Ability to move about work place via wheelchair, walker or cane for brief periods;

- Negligible amount of force frequently to constantly;

- Maximum force of one-to-ten-pound range occasionally; and

- Maximum force of negligible amount, less than one pound, to move items such as papers, pen or small production items.

(*Id.* at 185.) Based on its review, Hartford concluded the evidence did not support the existence of a physical or cognitive impairment so significant that Slaughter would be considered unable to perform his own occupation on a full-time basis as a systems engineer for any employer. (*Id.* at 187.)

On October 15, 2021, Slaughter, through counsel, requested an administrative appeal of Hartford's determination. (*Id.* at 593–99.) In support of his appeal, Slaughter submitted a vocational rehabilitation evaluation completed by Delores Gonzalez, a certified vocational rehabilitation counselor. (*Id.* at 600–27.) Gonzalez opined that, from a vocational perspective, Slaughter's difficulty with walking and balancing, as well as reduced focus, concentration, persistence, pace, and accuracy, impeded his ability to successfully return to the open labor market. (*Id.* at 624–26.) Gonzalez noted that Slaughter is unable to walk for longer than thirty minutes and uses a non-prescribed walker or holds onto furniture for support. (*Id.* at 601–02.) Based on her assessment and review of Slaughter's medical records, Gonzalez opined that Slaughter is not capable of any competitive work, and that prospective employers would avoid hiring someone with Slaughter's "overall profile in favor of individuals who are younger, more work ready, and who have the ability to work in an upright position at a competitive rate during work hours without accommodation." (*Id.* at 626–27.)

Slaughter also obtained an Independent Medical Evaluation from Paul Hinton, M.D. (*Id.* at 558–64.) Dr. Hinton noted in his report that Slaughter "ambulates with a slower pace and was winded after walking to the examination room on the far side of the building." (*Id.* at 562.) Hinton did not indicate whether Slaughter was using a walker during his appointment. Based on the results of his evaluation, Slaughter's verbal history, and his review of Slaughter's medical records, Dr. Hinton opined that Slaughter was functioning at a sub-sedentary capacity due to cardiomyopathy, heart

failure, and hypotension. (*Id.* at 564.) Dr. Hinton recommended that Slaughter continue attending cardiac rehabilitation to work on strength and conditioning; use caution when rising from a seated position and take time to gain his bearings before beginning to move; avoid any sort of exertion based on his limitations ambulating; avoid climbing stairs and unprotected heights due to balance issues; avoid stressful situations to reduce any strain on his heart; avoid any activity that exacerbates symptoms or is known to cause progression of the disease process; and continue routine follow ups with his primary care and heart specialist. (*Id.*)

In addition to his experts' reports, Slaughter submitted a Benefit Verification Letter from the Social Security Administration ("SSA"). (*Id.* at 272, 569–71.) The SSA letter states that: "We found that you have become disabled under our rules on August 27, 2020," but does not provide the SSA's rationale for this determination. (*Id.* at 570.) Slaughter did not submit any other documentation or medical records to Hartford in support of his appeal. (*Id.* at 272.)

For its own part, Hartford obtained the medical opinions of Stephen Broomes, M.D., a board-certified physician in internal medicine, and David Nowell, Ph.D., a licensed psychologist. (*Id.* at 548–51, 572–77, 578–92.) Dr. Broomes opined that Slaughter was functionally impaired and unable to work from August 25, 2020, through September 18, 2020, due to his inpatient hospitalization and recovery. (*Id.* at 586, 588.) Dr. Broomes further opined that Slaughter's medical records supported an ability to work from September 19, 2020, onward with the following restrictions and limitations:

14

- Sitting for one hour at a time for a total of eight hours per eight-hour day with the ability to take bathroom breaks when necessary;

- Standing for fifteen minutes at a time for a total of three hours per eight-hour day with a five-minute rest break before resuming any further activity;

- Frequently reach at waist level;

- Frequently use hands for grasping, feeling, fingering and handling, and keyboarding;

- Occasionally lift/carry and push/pull up to ten pounds;

- Occasionally reach below waist level and above shoulder level;

- Occasionally drive; and

- Never climb ladders, balance, work close to edges, or operate heavy machinery.

(*Id.* at 586–87.) Dr. Nowell, on the other hand, opined that the medical records did not support any specific restrictions based on depression, anxiety, panic attacks, or any other mental nervous conditions. (*Id.* at 575.)

On December 7, 2021, Hartford completed its review of Slaughter's appeal and upheld its original decision to deny LTD benefits as of February 23, 2021. (*Id.* at 270–74.)

## CONCLUSIONS OF LAW

Slaughter bears the burden of proving, by a preponderance of the evidence, that he continuously satisfied the Plan's requirements for payment of monthly disability benefits. *Halley v. Aetna Life Ins. Co.*, 141 F. Supp. 3d 855, 865 (N.D. Ill. 2015) (citing *Ruttenberg v. United States Life Ins. Co.*, 413 F.3d 652, 663 (7th Cir.

15

2005)). Because Slaughter must prove his entitlement to benefits, the Court does not resolve any doubts or gaps in the evidence in his favor. *Dorris*, 949 F.3d at 304; *Cheney v. Standard Ins. Co.*, 831 F.3d 445, 451 (7th Cir. 2016). In determining what Slaughter must prove, the Court looks to the Plan's terms and, to the extent they are consistent with ERISA, draws on federal common law and general principles of contract interpretation. *See Cheney*, 831 F.3d at 450.

## I. SLAUGHTER HAS NOT SATISFIED HIS BURDEN OF PROVING THAT HE MEETS THE DEFINITION OF "DISABILITY" UNDER THE PLAN

The Plan provides that Hartford will pay a monthly benefit if an insured "1) become[s] Disabled while insured under The Policy; 2) [is] Disabled throughout the Elimination Period; 3) remain[s] Disabled beyond the Elimination Period; and 4) submit[s] Proof of Loss to [Hartford]." (Admin Rec. at 1183.) Under the Plan, "Disability" or "Disabled" means that the insured is "prevented from performing one or more of the Essential Duties" of:

> 1) Your Occupation during the Elimination Period;
> 2) Your Occupation, for the 24 months following the Elimination Period, and as a result Your Currently Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and
> 3) after that, Any Occupation.

(*Id.* at 1192.) The Plan defines "Essential Duty" as a duty that "1) is substantial, not incidental; 2) is fundamental or inherent to the occupation; and 3) cannot be reasonably omitted or changed." (*Id.* at 1192.) For those who meet the definition of "Disabled" or "Disability," LTD benefits accrue as of the first day after the Elimination Period. (*Id.* at 1183.)

16

The parties agree that Slaughter's entitlement to benefits is resolved under the Plan's "Your Occupation" test of disability. (R. 29 at 5; R. 32 at 7.) In his application for LTD benefits, Slaughter indicated that the first day he was unable to work due to his disability was August 25, 2020. (Admin. Rec. at 1117.) Based on a date of disability of August 25, 2020, and following the Plan's 26-week Elimination Period, Slaughter's benefits would have accrued on February 23, 2021. Slaughter must therefore prove by a preponderance of the evidence that he was "prevented from performing one or more of the Essential Duties" of his occupation "as it is recognized in the general work place" from February 23, 2021 (when benefits commence) through February 22, 2023 (the end of the 24-month benefit period). (*Id.* at 1192, 1195.)

The parties agree that Slaughter's job as performed in the national economy is that of a Systems Engineer 5. (Pl.'s SOF ¶ 30; Def.'s PFF ¶ 17.) The physical requirement for a Systems Engineer 5 is sedentary. *See* U.S. DEP'T OF LABOR, *Dictionary of Occupational Titles*, Code 033.167-010, (4th ed. 1991). The U.S. Department of labor defines a sedentary job as one that involves:

> Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

*Id.* at Appendix C.

17

Systems Engineers must also perform cognitive tasks, including, but not limited to planning, scheduling, and directing the preparation of programs to process data and solve problems using computers; developing programs from workflow charts or diagrams; consulting and collaborating with others to develop new programming methods, clarify program intent, identify problems, suggest changes, and determine extent of programming and coding required. *Id.* at Code 033.167-010.

Slaughter contends that Gonzalez' vocational expert report is dispositive of his entitlement to LTD benefits because her opinions "unambiguously establish[] that [he] meets the definition of disability in that he is unemployable on the open job market." (R. 29 at 7.) The Court does not agree. In evaluating the reliability of functional capacity evaluations, courts are "free to weigh" various factors based on the individual circumstances of the assessment. *Scanlon v. Life Ins. Co. of N. Am.*, 81 F.4th 672, 679 (7th Cir. 2023). At bottom, the analysis turns on "the total mix of facts in a particular case." *Id.*

In reviewing Gonzalez' vocational report, the Court first notes that Gonzalez did not perform a physical assessment of Slaughter; rather she met with him virtually and reviewed his medical records. (*Id.* at 600.) Gonzalez opined that Slaughter was unemployable in the open labor market because (1) he could not meet the physical demands of the job given his difficulty with walking and balancing, (2) his daily functioning was affected by depression, anxiety, and panic, and (3) he suffered from chronic insomnia which impaired his ability to focus and concentrate during the workday. (Admin. Rec. at 625–26.) These conclusions, however, are not consistent

18

with the medical records. *See, e.g., Scanlon*, 81 F.4th at 679 (explaining courts should consider whether the results of a functional capacity evaluation are consistent or conflict with other medical examinations).

Slaughter never reported any falls due to balance issues to any of his treating physicians, nor was his walker prescribed by a medical professional. There are also no records that Slaughter pursued any additional treatment for his anxiety, depression, or panic following his psychiatry consult with Dr. Chilakamarri in September 2020. And Dr. Ellison indicated on his Attending Physician Statement that Slaughter did not suffer from any psychiatric or cognitive impairments that would affect his ability to work. Finally, Slaughter told Dr. Ellison at his appointment in January 2021 that he had received new CPAP equipment and was sleeping well. Thus, the Court does not find that Gonzalez' report is dispositive of Slaughter's entitlement to LTD benefits.

Slaughter's SSA disability determination is not dispositive of his claim, either. "[A] Social Security decision is only 'one more factor for consideration in an ERISA benefits determination.'" *Dorris*, 949 F.3d at 305 (quoting *Black v. Long Term Disability Ins.*, 582 F.3d 738, 748 (7th Cir. 2009)). Here, the administrative record does not contain the SSA's rationale for its disability determination. Without the SSA's rationale, it is difficult to determine what weight, if any, to give to the SSA determination.

Gonzalez' report and the SSA's determination aside, there remain competing medical opinions regarding Slaughter's physical limitations. Of these competing

opinions, only one, Dr. Ellison's, was offered by a physician who actually treated Slaughter. In his Attending Physician Statement, Dr. Ellison prescribed certain restrictions with respect to physical tasks, such as limiting standing to one hour at a time for a total of two hours and limiting walking to an hour, total, for an eight-hour workday. (Admin. Rec. at 1122.) Such physical tasks, however, do not speak to the most critical requirement of Slaughter's sedentary occupation: the ability to sit. *See Dictionary of Occupational Titles* at Appendix C ("Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time."); *see also Scanlon*, 81 F.4th at 678 (explaining the capacity to perform "active physical tasks" was unrelated to insured's sedentary job, which required the ability to sit at a computer and type for eight hours a day). And for that activity, Dr. Ellison did not prescribe any restrictions. (*Id.* at 1122.) Indeed, Ellison confirmed to Hartford's retained expert, Dr. Guzzo, that Slaughter could perform "light activity." (Admin. Rec. at 875.)

Notwithstanding, Slaughter contests his ability to perform the essential duties of his job based on the long distances that he must walk and the stairs that he must take at the office. (*Id.* at 51, 561.) But these "requirements" are specific to Boeing's office building and location—not the occupation of a Systems Engineer "as it is recognized in the general workplace." (*See* Admin. Rec. at 1195 ("Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location.").) Accordingly, for the reasons discussed above, the Court is not

persuaded that Slaughter has met his burden of proof as to his inability to perform one or more of the essential duties of his occupation from February 23, 2021, onward.

## II. SLAUGHTER HAS NOT SATISFIED HIS BURDEN OF PROVING THAT HE WAS UNDER THE "REGULAR CARE OF A PHYSICIAN" FOR THE DURATION OF THE BENEFIT PERIOD

Even if Slaughter had met his burden under the "Your Occupation" test for disability, his LTD claim runs into another obstacle. The Plan states that it "does not cover, and [ ] will not pay a benefit for, any Disability: 1) unless You are under the Regular Care of a Physician." (Admin. Rec. at 1186.) "Regular Care of a Physician" means that the insured is being treated by a physician: "1) whose medical training and clinical experience are suitable to treat [the] disabling condition; and 2) whose treatment is: a) consistent with the diagnosis of the disabling condition; b) according to guidelines established by medical, research, and rehabilitative organizations; and c) administered as often as needed; to achieve the maximum medical improvement." (*Id.* at 1194.) As the Seventh Circuit has explained, "the purpose of the clause requiring the insured to be 'under the regular care and attendance of a physician' is to determine that the claimant is actually disabled. . ., is not malingering, and to prevent fraudulent claims." *Heller v. Equitable Life Assurance Soc'y of U.S.*, 833 F.2d 1253, 1257 (7th Cir. 1987) (quoted case omitted).

Slaughter argues that the "Regular Care of a Physician" provision should not be considered because the frequency with which he was expected to visit a doctor is vague. (R. 35 at 8.) "Although 'regular care' does not require monthly visits with accompanying monthly reports," it does require evidence of "some form of continuity

in the insured's treatment by physicians." *May v. Nat'l Life Ins. Co.*, No. 96 C 616, 1997 WL 461085, at *6 (N.D. Ill. Aug. 8, 1997). In this case, the administrative record does not support a finding that Slaughter was under the regular care of a physician beyond January 26, 2021—the date of Slaughter's last appointment with Dr. Ellison. The medical records from his appointment show that Dr. Ellison instructed Slaughter to follow up with him within six weeks, and Dr. Ellison's Attending Physician Statement indicates that Slaughter's next office visit was scheduled for March 10, 2021. (Admin. Rec. at 889, 1121.) Slaughter, however, did not provide any documentation to establish that the March 10, 2021, appointment actually took place.

The only evidence of continued care beyond January 26, 2021, is: (1) a letter purportedly from Dr. Ellison dated March 9, 2021, (Admin. Rec. at 866), and (2) Slaughter's affidavit asserting that he sees Dr. Ellison every three months. (R. 36-1 ¶ 4.) As to Dr. Ellison's letter, its reliability is questionable. The letter was not signed by Dr. Ellison, it was not written on the doctor's letterhead, and it was not accompanied by any updated medical records despite its reference to "recent office visits." (Admin. Rec. at 865–67.)

As to Slaughter's affidavit, Slaughter submitted this extra-record document notwithstanding the parties' agreement to forego discovery and resolve the case based on the administrative record alone. (R. 21 at 2.) Nevertheless, given that courts should "freely allow the parties to introduce relevant extra-record evidence" in ERISA cases subject to *de novo* review, the Court will consider it. *Dorris*, 949 F.3d at 304. The Court notes, however, that "self-report evidence," such as Slaughter's affidavit,

does not serve as a "trump card." *Canter v. AT&T Umbrella Benefit Plan No. 3*, 33 F.4th 949, 957 (7th Cir. 2022). "The record as a whole is what matters." *Id.*

Considering Slaughter's affidavit in light of the administrative record as a whole, the Court is not persuaded that Slaughter has established the continuity of care that is required under the Plan. Although Slaughter asserts that he sees Dr. Ellison every three months, he did not submit any updated medical records to Hartford in support of his appeal. Rather, Slaughter provided only independent expert reports from Gonzalez and Dr. Hinton. Notably, the medical records provided to Gonzalez and Dr. Hinton for review did not extend beyond Slaughter's January 26, 2021 appointment with Dr. Ellison. (Admin. Rec. at 561, 623.) Further, in consultation with Dr. Hinton, Slaughter "denie[d] further treatment for his injuries." (*Id.* at 561.) In fact, Dr. Hinton advised Slaughter that he "needs to continue routine follow ups with his primary care and his heart specialist." (*Id.* at 564.) This instruction gives rise to the inference that such appointments were not routinely occurring at the time he saw Dr. Hinton in December 2021.

Slaughter also stated in his affidavit that he participates in cardiac rehabilitation therapy three times a week. (R. 36-1 ¶ 5.) This is consistent with what he reported to Dr. Hinton. (Admin. Rec. at 561.) Beyond Slaughter's statements, however, there is no evidence from the cardiac rehabilitation provider in the administrative record. Without such evidence, the Court cannot determine whether this satisfies the "Regular Care of a Physician" provision.

Given the insufficient evidence of continuity of care, the Court finds that Slaughter has failed to carry his burden of proving his entitlement to LTD benefits under the Plan. Accordingly, the Court enters judgment in favor of Hartford.

## CONCLUSION

For the reasons discussed herein, Defendant Hartford Life & Accident Insurance Company's motion for judgment [31] is granted. Plaintiff Kenneth Slaughter's motion for summary judgment [27] is denied. Judgment shall be entered in favor of the defendant and against the plaintiff. Civil case terminated.

Date: July 1, 2024

_____
JEREMY C. DANIEL
United States District Judge

24